# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

COURTNEY R. LOGAN, )
)
    Petitioner, )
) No. 3:13-cv-00743
v. )
) Judge Trauger
STATE OF TENNESSEE, *et al.,* )
)
    Respondents. )

## MEMORANDUM OPINION AND ORDER

Pending before the court is a pro se petition under 28 U.S.C. § 2254 for a writ of habeas corpus filed by Courtney R. Logan, an inmate of the Hardeman County Correctional Complex in Whiteville, Tennessee. (Doc. No. 1).

Respondent filed a Motion to Dismiss the petition (Doc. No. 108), to which Petitioner responded in opposition (Doc. Nos. 110, 111). Petitioner then filed a Motion for Leave to Amend Petition (Doc. No. 112), to which Respondent responded in opposition (Doc. No. 113). Petitioner also filed a Request for Discovery (Doc. No. 114).

All motions are ripe for review. For the reasons set forth herein, Petitioner's Motion for Leave to Amend Petition will be denied, as will Petitioner's Request for Discovery. Petitioner is not entitled to an evidentiary hearing, and the court will grant Respondent's Motion to Dismiss.

## I.  BACKGROUND

In 2009, Petitioner helped his cousin (who was a Mississippi inmate at that time) escape from custody. The escape took place across two states and resulted in the shooting of a Tennessee officer. The escape began in Mississippi, where Petitioner held up an optometrist's office during his cousin's appointment so that his cousin could escape. *Logan v. Haslam*, No. 3:18-cv-00256,

1

2019 WL 4142160, at *1 (M.D. Tenn. Aug. 30, 2019) (Crenshaw, J.) (citing *Logan v. State*, 192 So. 3d. 1012, 1015-17 (Miss. Ct. App. 2015)). Petitioner fired two shots, threatened to kill multiple officers and clinic employees, and then drove his cousin to Tennessee. *Logan*, 192 So. 3d. at 1015-17. While driving through Nashville, Petitioner was pulled over on the interstate. *Logan*, 2019 WL 4142160, at *1. His cousin shot the officer, and Petitioner drove them away from the scene. *Id*.

A Davidson County, Tennessee jury convicted Petitioner of attempted first-degree murder and employment of a firearm during a dangerous felony, resulting in a 31-year sentence. *Id*. He was then extradited to Mississippi, where he was convicted of aiding escape, being a felon in possession of a firearm, and five counts of kidnapping. *Id*. The Mississippi court imposed seven consecutive life sentences without the possibility of parole. *Id*. Under an agreement between the states, Petitioner was extradited to Tennessee to serve the remainder of his 31-year sentence, after which he will return to Mississippi to serve his life sentences. *Id*. at 2.

## II. PROCEDURAL HISTORY

Petitioner filed the instant petition[1] on July 19, 2013.[2] (Doc. No. 1, PageID# 15). Because state-court proceedings in Tennessee were ongoing then, the court dismissed the petition without

---

[1] Petitioner has filed two other separately-docketed petitions in this court challenging the same convictions and extraditions, both of which were dismissed without prejudice for failure to exhaust state-court remedies. His first petition was filed in 2012, before the instant petition. *Logan v. Howerton*, No. 3:12-cv-00550 (M.D. Tenn. July 12, 2012) (Sharp, J.) (Doc. No. 13, PageID# 100). After the Sixth Circuit denied a certificate of appealability on that petition, Petitioner filed the instant petition. The other petition—Petitioner's third—was filed after the instant petition, on July 17, 2015. *Logan v. Haslam*, No. 3:15-cv-00787, 2015 WL 5577630, at *1 (M.D. Tenn. Sep. 22, 2015) (Crenshaw, J.).

[2] Under the "prison mailbox rule" of *Houston v. Lack*, 487 U.S. 266, 270 (1988), and the Sixth Circuit's subsequent extension of that rule in *Richard v. Ray*, 290 F.3d 810, 812 (6th Cir. 2002) and *Scott v. Evans*, 116 F. App'x 699, 701 (6th Cir. 2004), a prisoner's legal mail is considered "filed" when he deposits his mail in the prison mail system to be forwarded to the Clerk of Court. Pursuant to this authority, the Court finds that Petitioner filed his petition on July 19, 2013, the date he signed the petition (Doc. No. 1, PageID# 15), even though the Clerk of Court received and

2

prejudice. (Doc. Nos. 35 & 36). For the next decade, Petitioner's state-court litigation continued; he challenged his Tennessee convictions on direct appeal, *State v. Logan*, No. M2014-10687-CCA-R3-CD, 2015 WL 5883187 (Tenn. Crim. App. Oct. 8, 2015),[3] *perm. app. denied* (Tenn. Feb. 18, 2016), and in post-conviction proceedings, *Logan v. State*, No. M2018-01786- CCA-R3-PC, 2020 WL 918607 (Tenn. Crim. App. Feb. 26, 2020), *perm. app. denied* (Tenn. July 20, 2020). He challenged his extradition between Tennessee and Mississippi through various state petitions, including petitions for writ of habeas corpus. *See Logan v. State*, No. M2023-01391- CCA-R3-ECN, 2024 WL 3508012, at *1 (Tenn. Crim. App. July 23, 2024), *perm. appeal denied* (Tenn. Dec. 10, 2024).

During the pendency of his state-court proceedings, Petitioner repeatedly sought to reopen the instant federal habeas case, but the court denied these attempts for failure to exhaust state-court remedies in each instance. (*See* Doc No. 104, PageID# 1978). State-court proceedings concluded on December 10, 2024, when the Tennessee Supreme Court denied permission to appeal the affirmation of the dismissal of Petitioner's error coram nobis petition. *See Logan*, 2024 WL 3508012, at *2.

---

docketed the petition on July 24, 2013. True, Petitioner did not provide the date on which he placed the petition into the prison mail system, but he signed the petition on July 19, 2013 and the envelope in which he mailed the petition is postmarked July 22, 2013 (Doc. No. 1-1, PageID# 1); thus, Petitioner placed the petition into the prison mail system no earlier than July 19, 2013 and no later than July 22, 2013. In any event, the five-day difference between the date Respondent cites (July 24, 2013) and the date the Court uses (July 19, 2013) is of no consequence here.

[3] On direct appeal, the Tennessee Court of Criminal Appeals affirmed the judgments of the trial court in all respects, except that it remanded for entry of a corrected judgment showing a conviction for employment of a firearm during the flight or escape from the attempt to commit a dangerous felony in count 3 and either redacting the word "Violent" and leaving the 100% release eligibility designation or using the "Special Conditions" section of the judgment form to specify that Logan received a sentence of six years at one hundred percent release eligibility for his conviction under Tennessee Code Annotated § 39-17324(b)(4). *State v. Logan,* 2015 WL 5883187, at *17.

3

On November 18, 2024,[4] Petitioner filed a motion titled "Miscarriage of Justice" (Doc. No. 100) which the court construed as a motion to reopen habeas proceedings and to which the court directed Respondent to file a response stating whether any relevant state-court litigation was pending. (Doc. No. 104). Respondent informed the court that none was pending. (Doc. No. 106). On July 7, 2025, the court granted the motion to reopen and directed Respondent to respond specifically to the petition filed on July 19, 2013. (Doc. No. 107, PageID# 1990 n.1) (noting that Petitioner has submitted one habeas petition in this case and has been advised that he cannot litigate this action by way of notices, letters, and supplements).

### III. MOTION FOR LEAVE TO AMEND PETITION

After Respondent moved to dismiss the habeas petition, Petitioner sought leave to amend his petition. (Doc. No. 112). He asks the court to allow him to add a claim of ineffective assistance of counsel, alleging that the claim relates back to the original petition and therefore merits consideration under Federal Rule of Civil Procedure 15. (*Id*., PageID# 2074-76). In response, Respondent contends that, "if the claims Petitioner seeks to graft onto his petition relate back to the original petition, they are untimely, because the petition is untimely. And if the claims do not relate back to the original petition, they cannot be raised now."[5] (Doc. No. 113, PageID# 2).

Amendments to a civil pleading such as the instant petition are permitted as a matter of course only within twenty-one days of service of a response to the pleading. Fed. R. Civ. P. 15(a)(1). Later amendments require either the opposing party's consent, the court's leave, or

---

[4] Respondent again uses the date of docketing (December 4, 2024) as the date on which Petitioner filed this motion. (*See* Doc. No. 109, PageID# 2000). The court applies the prison mailbox rule and finds that the date Petitioner signed the motion (November 18, 2024) is the proper date. (*See* Doc. No. 100, PageID# 1883). In any event, the fifteen-day difference between the two dates is of no consequence in this case.

[5] Respondent refers to Petitioner's "claims," but Petitioner seeks to add only one claim.

relation back to the original petition. Fed. R. Civ. P. 15(a)(2), (c). The instant Motion to Amend was filed well after the twenty-one day period, and Respondent objects to the motion. Thus, the court must determine whether the amended petition relates back to the original petition.

An amendment relates back to the original petition if "it raises a claim that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c). Because the Federal Rules of Civil Procedure may be applied to habeas cases only "to the extent they are not inconsistent with" federal habeas law, the Supreme Court mandates that courts applying Rule 15 respect the heightened pleading standard Habeas Rule 2(c) demands of habeas petitions. *Mayle v. Felix*, 545 U.S. 644, 655-56 (2005). Therefore, a habeas claim relates back to the original petition "[s]o long as the original and amended petitions state claims that are tied to a common core of operative facts . . . ." *Id*. at 664.

Respondent contends that Petitioner's amended petition, if permitted, would be untimely filed.[6] The Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (codified, *inter alia*, at 28 U.S.C. §§ 2244, *et seq*.), imposes a one-year statute of limitations on federal habeas corpus petitions, which runs from the latest of four (4) circumstances, one of which appears to be relevant here—"the date on which the [state court] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review[.]" 28 U.S.C. § 2244(d)(1)(A). The AEDPA's one-year limitations period is tolled by the amount of time that "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending . . . ." 28 U.S.C. § 2244(d)(2); *see Ege v. Yukins*, 485 F.3d 364, 371 (6th Cir. 2007). However, any lapse of time before a state

---

[6] Respondent's argument did not address whether the amended claim relates back to the original petition.

application is properly filed is counted against the one-year limitations period. *See Bennett v. Artuz*, 199 F.3d 116, 122 (2d Cir. 1999), *aff'd*, 531 U.S. 4 (2000). When the state collateral proceeding that tolled the one-year limitations period concludes, the limitations period begins to run again at the point where it was tolled rather than beginning anew. *See Allen v. Yukins*, 366 F.3d 396, 401 (6th Cir. 2004) (citing *McClendon v. Sherman*, 329 F.3d 490, 494 (6th Cir. 2003)).

Here, state-court direct review of Petitioner's convictions concluded with the Tennessee Supreme Court's denial of permission to appeal on February 18, 2016. *See Logan*, 2015 WL 5883187. The judgments became final for AEDPA purposes when the ninety-day period to seek certiorari in the United States Supreme Court expired on May 18, 2016. The one-year statute of limitations began the following day, May 19, 2016. *See Bronaugh v. Ohio*, 235 F.3d. 280, 285-86 (6th Cir. 2000) (applying Federal Rule of Civil Procedure 6(a) in determining on which day the AEDPA statute of limitations began running). Thus, Petitioner had one year from May 19, 2016 to timely file his federal habeas petition. However, Petitioner's filing of his post-conviction petition tolled the statute on June 6, 2016, after nineteen days of the AEDPA one-year period had run.

On July 20, 2024, Petitioner completed the state post-conviction process when the Tennessee Supreme Court denied his application for discretionary review. *See Logan*, 2020 WL 918607. Thus, the AEDPA limitations period resumed the next day, July 21, 2024. *See* Fed. R. Civ. P. 6 (a)(1)(A) (when the period is stated in days or a longer unit of time, exclude the day of the event that triggers the period). Since nineteen days of the one-year limitation period had run,

Petitioner had 346 days, or until July 1, 2021, to timely file his federal habeas petition. Because Petitioner filed his federal habeas petition on July 19, 2013,[7] the original petition was timely filed.

Under Rule 15(c), relation back allows an amended complaint to be treated as if it were filed on the same day as the original pleading, provided the new claims arise out of the same "conduct, transaction, or occurrence." Fed. R. Civ. P. 15(c). In the context of habeas corpus, the new claims must share a "common core of operative facts" with the claims in the original, timely filed petition for relation back to be appropriate. *Mayle v. Felix*, 545 U.S. 644, 650 (2005) (referencing "AEDPA's installation of a tight timeline" for habeas petitions). If the claims do not relate back, the date of the amended petition is used. In this case, that would result in the new claims being barred by the one-year AEDPA statute of limitations because the amended petition was filed on November 18, 2024—over three years beyond July 1, 2021.

Petitioner seeks to amend his petition to add a claim of ineffective assistance of counsel based on trial counsel's failure to challenge the constitutionality of the initial traffic stop that led to Petitioner's detention and subsequent conviction. (Doc. No. 112, PageID# 1). Petitioner alleges that the claim "arises from the same set of operative facts and counsel's representation already at issue" in his initial habeas petition. (*Id*., PageID# 3). Petitioner alleges in his initial habeas petition a single ineffective assistance claim—that trial counsel's "failure to investigate resulted in Attorneys incompetence in filing a 404(b) motion" and therefore "defaulting on Petitioner's [Fourth] Amendment claim." (Doc. No. 1, PageID# 9).

---

[7] Respondent argues that the date the court should use for determining the timeliness of "Petitioner's federal habeas petition" is "at the earliest, December 4, 2024, when [Petitioner] filed a motion construed by the Court as a motion to reopen habeas proceedings." (Doc. No. 109, PageID# 1999). This assertion does not reflect the correct application of the relation back rule.

After reviewing the original habeas petition and the proposed amendment, the court finds that the two ineffective assistance of counsel claims do not share a common core of operative facts. The operative facts for the ineffective assistance of counsel claim raised in Petitioner's original habeas petition concern the investigative steps trial counsel took in preparing for Petitioner's Rule 404(b) hearing.[8] The operative facts for the ineffective assistance claim Petitioner wishes to raise in an amended habeas petition concern the reason(s) for Plaintiff's traffic stop by Sergeant Mark Chestnut on June 25, 2009 and trial counsel's choices regarding whether and how to pursue challenges to that traffic stop.[9] Because the claims do not share a common core of operative facts, the claim Petitioner wishes to assert in an amended habeas petition does not relate back to the original habeas petition; the new claim, if permitted, would be barred by the one-year AEDPA statute of limitations. Accordingly, Petitioner's Motion for Leave to Amend Habeas Petition to assert the time-barred claim (Doc. No. 112) will be denied.

### IV. MOTION FOR DISCOVERY

Petitioner also has filed a Request for Discovery (Doc. No. 114) in which he asks the respondent to produce a "DVD interrogation" conducted at the Nashville Police Department by Detectives Norris Tarkington and Charles Robinson on June 25, 2009. (*Id.*, PageID# 1).

"Courts can 'allow a petitioner to engage in discovery upon a showing of good cause.'" *Wilson v. Williams*, No. 4:20-cv-00794, 2020 WL 4548246, at *1 (N.D. Ohio. Aug. 6, 2020). This standard requires "reason to believe that the petitioner[s] may, if the facts are fully developed, be

---

[8] In a Rule 404(b) hearing, the judge determines if a defendant's "other crimes, wrongs, or acts" can be used as evidence during a trial. During Petitioner's post-conviction hearing, he alleged that "[t]rial counsel testified that he filed a motion to exclude evidence of Petitioner's crimes in Mississippi under 404(b)." *Logan*, 2020 WL 918607, at *1-2.

[9] Petitioner alleged during his post-conviction hearing that "trial counsel should have challenged the traffic stop for lack of probable cause." *Logan*, 2020 WL 918607, at *1-2.

8

able to demonstrate that [they are] entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 909-910 (1997).

Petitioner seeks discovery "for the purpose of establishing [whether] petitioner had asserted his right to counsel to detective Norris Tarkington and whether the detective[s] from Tennessee and Mississippi conspired to violate petitioner[']s right to counsel in conducting the interrogation on 7-9-2009 in Davidson county . . . ." (Doc. No. 114, PageID# 1). But Petitioner has not raised a claim related to his *Miranda* rights. Neither did Petitioner attempt to raise such a claim in his proposed amended habeas petition. Discovery related to a claim that Petitioner has not alleged would not demonstrate that Petitioner is entitled to relief. See *Bracy*, 520 U.S. 899, 909-910. Thus, Petitioner's Request for Discovery (Doc. No. 114) will be denied.

## V. REVIEW OF HABEAS PETITION

Petitioner raises four claims in his Section 2254 petition. Three claims relate to his 2011 extradition from Tennessee to Mississippi. The fourth claim is an ineffective assistance of counsel claim.

A. <u>Statement of Facts</u>

The Tennessee Court of Criminal Appeals summarized the proof adduced at Petitioner's trial as follows:

> Sergeant Mark Chestnut, an officer with the Metropolitan Nashville Police Department for the last twenty-four years, testified that his career ended the day he initiated a traffic stop of Logan and was shot five times by Jackson, the co-defendant passenger. On June 25, 2009, he stopped a rental car with a Georgia tag driven by Logan because Logan was not wearing his seat belt. The stop occurred on Interstate 40 near the Bellevue area just outside of Nashville. Sergeant Chestnut approached the car on the passenger's side and asked Logan for his driver's license and either the registration papers or the rental documents for the car. Logan provided his license and confirmed that the car was a rental car but was unable to locate the rental papers for the vehicle. While Sergeant Chestnut was talking to Logan, he observed another person sitting in the back seat of Logan's vehicle. Because Sergeant Chestnut "thought it was unusual" that a person was sitting in the

9

back seat when the front passenger seat was empty, he asked Logan to step out of his vehicle. He then asked Logan about the car he was driving, where he was coming from, and where he was going. Logan replied that he had rented the car from the airport in Louisville, Kentucky, although he could not recall the rental company. Logan claimed he was coming from Nashville, but he gestured that he had come from a different direction. Logan also said he was going to a small community in north Nashville known as Dodge City.

Sergeant Chestnut noticed that Logan hesitated before answering nearly all of his questions. Logan continued to provide evasive responses when he was asked about his employment. After talking with Logan, Sergeant Chestnut spoke to the other occupant of the car. Although Logan had said that his passenger's name was "James Gibbs," the passenger told Sergeant Chestnut that his name was Joseph Jackson. The passenger was unable to provide any identification. When Sergeant Chestnut observed one or two sets of handcuffs on the floorboard of the car beneath Jackson's feet, he asked Jackson about them but did not recall his answer. He also asked Jackson where they had been, and Jackson replied, "Louisiana." He noted that Jackson's responses to his questions differed from the responses given by Logan.

After talking with Jackson, Sergeant Chestnut walked back to Logan. He asked that Logan stand on the shoulder, near the right front bumper of his patrol car, while Jackson remained in the back seat of the rental car. Sergeant Chestnut then returned to his patrol car and called for backup. Although he felt Logan and Jackson were involved in "some serious criminal activity," he did not indicate this to the suspects. Sergeant Chestnut called the Blue Lighting Operation Center (BLOC) to get national record checks for Logan and Jackson, and while he was on the phone, Jackson exited the rental car and walked to the front passenger window of his patrol car. When Sergeant Chestnut rolled down the window, Jackson gave him a telephone number for his father, so that his father could verify his identity, before returning to the rental car. A few moments later, while Sergeant Chestnut was still on the phone with BLOC, he saw that Jackson had returned and was standing near the front bumper of his patrol car.

Sergeant Chestnut stated that Jackson approached and said "something normal[.]" He then pulled the gun from his waistband and pointed at him, shooting him four times. During the shooting, Logan was standing twelve or thirteen feet away from Jackson. After he was shot, Sergeant Chestnut "saw Mr. Jackson coming back toward [him]." He thought, "[Jackson's] coming back to kill me or make sure I'm dead." Sergeant Chestnut was able to reverse his car away from Jackson and Logan, and observed them run back toward their car and take off. Logan was driving when he and Jackson left the scene. As soon as Sergeant Chestnut put his car in reverse, he relayed a message on his radio stating that he had been shot, providing his location, and giving a description of the two suspects and their vehicle.

10

Sergeant Chestnut identified Jackson from a photograph entered into evidence and stated that Jackson was wearing the same clothes in the photograph as the ones he was wearing the day he was shot. He also identified Logan from another photograph and observed that Logan was also wearing the same clothes in the photograph as the ones he had on the day of the shooting. In addition, he identified a photograph of the inside of his police car, which showed a silver revolver in the area between the front passenger seat and the door. He confirmed that this revolver did not belong to him and that he had been shot with "a silver revolver."

At this point during Sergeant Chestnut's testimony, the jury was excused, and the trial court conducted a Rule 404(b) hearing in which four Mississippi witnesses and Detective Norris Tarkington testified. At the conclusion of this hearing, the trial court took the matter under advisement.

The jury was brought back into the courtroom, and Sergeant Chestnut continued his testimony in the presence of the jury. The State played a video/audio recording of the traffic stop taken from equipment inside Sergeant Chestnut's patrol car. The recording contained video and audio of the conversations Sergeant Chestnut had with Logan and Jackson, although the audio portions of these conversations were difficult to hear because of road noise. Sergeant Chestnut returned to his patrol car, shut his door, and turned off the audio portion of the recording in order to make phone calls to another officer and to BLOC. During this time period, the recording showed Jackson leaning out of the rental car, apparently communicating with Logan. A moment later, Jackson exited the rental car, raised his hands, and motioned for permission to approach before walking up to the passenger side of Sergeant Chestnut's patrol car. Although there was no sound for this portion of the recording, it showed Jackson returning to the rental car and getting in, even though his door remained open. The recording then depicted Jackson exiting the rental car a second time, again raising his hands, and approaching the passenger side of Sergeant Chestnut's patrol car. The recording did not have audio at this point and did not show Jackson shooting Sergeant Chestnut inside his patrol car, although this is the time period when the shooting occurred. As Jackson returned to the passenger side of the rental car, Logan turned and smiled at Sergeant Chestnut before quickly getting into the driver's seat of the rental car. Jackson began walking toward Sergeant Chestnut's patrol car a third time and then turned and ran to the rental car and climbed inside. Sergeant Chestnut placed his car in reverse as Logan and Jackson drove away.

Sergeant Chestnut acknowledged that when he activated his blue lights to initiate the traffic stop, Logan immediately stopped his vehicle. He said he did not observe any contraband on Logan's person and did not believe that Logan was armed when he exited his vehicle. Sergeant Chestnut admitted that Logan did not move from the location where he told him to stand until after Jackson shot him. He said Logan never tried to distract him and never approached his car window to try

11

to talk to him. Sergeant Chestnut never observed Logan talking to Jackson during the traffic stop.

William Morgan, an officer with Interdiction unit of the Metropolitan Nashville Police Department, testified that he was working on June 25, 2009, and drove past Sergeant Chestnut's stop of Logan and Jackson in order to stop a different vehicle. Moments later, Sergeant Chestnut requested that Officer Morgan return to the location of his stop for backup, and Officer Morgan headed in Sergeant Chestnut's direction. As Officer Morgan was waiting for a red light, Sergeant Chestnut contacted him a second time, informing him that he had been shot. Officer Morgan was the first officer to arrive at the scene after the shooting. Sergeant Chestnut told him "that the car that he stopped had a Georgia tag" and that "he had been shot four times with a revolver, a silver handgun." As Sergeant Chestnut was being treated and removed from his patrol car, Officer Morgan found Logan's driver's license. He later replayed the recording of the stop, got the tag number for Logan's rental car, and relayed this information over the radio.

Matthew Dixon, a detective with the Specialized Investigation Division of the Metropolitan Nashville Police Department, testified that his supervisor, Sergeant Duncan, informed him that Sergeant Chestnut had been shot and gave him a description of Logan's rental car. As Detective Dixon drove to the area where the shooting occurred, he noticed a car matching the description of the suspects' vehicle. Detective Dixon confirmed that the license tag of this vehicle matched the tag of the car involved in the shooting. Shortly thereafter, Detective Dixon and Sergeant Duncan blocked Logan's car. When Logan's vehicle stopped, more than ten police officers were present when Logan and Jackson exited the car and were taken into custody. After Logan exited the driver's side of the rental car, Detective Dixon recalled seeing two ammunition magazines and a pair of gloves lying on the ground just outside the driver's side of the vehicle. He said one of the officers had removed these two magazines from Logan's person. Detective Dixon acknowledged that Logan did not resist arrest or assault any officers as he was taken into custody.

William Kirby, an officer with the Crime Scene section of the Metropolitan Nashville Police Department, testified that he processed the scene where Logan's car was stopped by Sergeant Duncan and Detective Dixon. Officers found a loaded FEG semiautomatic pistol on top of the center console of Logan's car, several zip ties, and a holster for this pistol in a green duffle bag in the backseat of the car. They also found a set of leg shackles and handcuffs on the floorboard of the vehicle's backseat. The keys to these shackles and handcuffs were found inside the car. In addition, officers found a receipt for shoes that were purchased at Foot Action in Louisville, Kentucky, on June 24, 2009, as well as a Walgreens receipt for the same date inside the car.

At the conclusion of Officer Kirby's testimony, the jury was excused, and the trial court ruled that the evidence of the offenses and acts committed by Logan

12

in Mississippi would be admitted because "the probative value of the proof outweighs the prejudicial value towards motive and intent[.]"

Norris Tarkington, a detective with the Metropolitan Nashville Police Department, testified that he investigated Sergeant Chestnut's shooting. He described the accident scene when he arrived and observed "a handgun wedged between the seat and where the door would have been closed." Detective Tarkington identified a photograph showing that the handgun, a silver revolver, had six shell casings inside the cylinder. He said only five of the six bullets had fired because one had misfired. Of the five bullets that fired, two bullets entered Sergeant Chestnut's body, two were stopped by his protective vest, and one of the bullets went through the driver's side door. One of the bullets recovered from Sergeant Chestnut's body and the two bullets recovered from his vest were sent to the Tennessee Bureau of Investigation crime laboratory for analysis, and testing showed that all three bullets were fired from the same handgun, a Model 64 .38 revolver.

Detective Tarkington's investigation revealed that Logan and Jackson had originally come from Greenwood, Mississippi, where Jackson had escaped from custody of the CCA Delta Correctional Institution. He said that Jackson was able to escape during an eye examination at an optometrist's office in Greenwood at 8:00 a.m. on June 25, 2009, and that Sergeant Chestnut had stopped Logan and Jackson just outside of Nashville at 12:55 p.m. that day. The distance between Greenwood, Mississippi, and the location of the traffic stop in Tennessee was 324.17 miles, and the travel time for this trip was five hours and eight minutes. Following the incident, Detective Tarkington travelled to the Greenwood optometrist's office, where employees Margaret Davis and Ashley Bowlin identified Logan from a photographic lineup as the man who helped Jackson escape. Detective Tarkington also interviewed Sergeant Perry Jones and Sergeant Chrissy Flowers, two correctional officers present during the escape, who also identified Logan from a photographic lineup as the man who helped Jackson escape. Detective Tarkington learned that the silver revolver used to shoot Sergeant Chestnut had been stolen from one of the correctional officers during the escape. He also recovered a cellular telephone during his investigation and learned that Logan and Jackson had been communicating through text messages and phone calls during Jackson's incarceration, even though Jackson was not allowed to possess or use a cellular phone.

Detective Tarkington also discovered that the rental car driven by Logan the day of the shooting had been rented by Logan's mother on the afternoon of June 24, 2009. The receipt found inside Logan's car showed that a new pair of shoes had been purchased on June 24, 2009, and officers determined that Jackson was wearing a new pair of shoes when he was taken into custody. In addition, the Walgreens receipt found in Logan's car showed that a card for cell phone minutes had been purchased for a temporary cellular phone.

Sergeant Chrissy Flowers, a corrections officer at the Delta Correctional Facility in Greenwood, Mississippi, testified that she transported Jackson for his eye examination at the optometrist's office on June 25, 2009, at 8:00 a.m. Although two other correctional officers were present, Sergeant Flowers was the only officer armed, and she carried a .38 caliber revolver with a six-round capacity. Just after they arrived, Logan stepped inside the office. Logan carried a green duffle bag on his arm and fired his first shot into the ceiling as he screamed for everyone to get on the ground. At the time, Sergeant Lee Robertson was with Jackson and a nurse in the first examination room. A second nurse was sitting behind the desk, and Sergeant Flowers and Sergeant Jones were sitting in the waiting room. Logan continued to scream and curse and demanded "the keys." He stood over Sergeant Flowers and threatened to shoot her in the head if she did not give him the keys. When Logan held his gun to her head, Sergeant Flowers begged him not to kill her. She said Logan's gun was a black nine millimeter. Initially, Sergeant Flowers and the other two correctional officers believed that Logan was there to rob the optometrist's office. They later realized that Logan wanted the keys to unlock Jackson's handcuffs and leg shackles, and Sergeant Robertson threw the keys over the counter. Logan then ordered Sergeant Flowers to uncuff Jackson. Although she was able to uncuff Jackson on one side, she had difficulty releasing the other side. Jackson eventually got the keys from her to uncuff himself. When Jackson saw Sergeant Flowers trying to use her cellular phone to dial 9-1-1, he took it from her.

Sergeant Flowers said that when Logan walked around to tell her he was going to shoot her in the head, he saw that she had a gun. Logan began screaming at her to give him the gun, and as she went for the gun, he screamed at her to let him see her hands. She begged Logan to calm down, and Logan unsnapped her holster and removed her revolver, which had been issued to her by the Delta Correctional Institution. She said that at some point, Logan fired a second shot into the ceiling, and Jackson attempted to calm Logan because he was "screaming" and "jumping around." Sergeant Flowers said Jackson changed into clothes from the green duffle bag Logan had brought with him. Once Logan and Jackson left the office, Sergeant Jones called 9-1-1.

Sergeant Flowers identified Logan at trial and from a photographic lineup as the man who fired a shot into the air and put his gun to her head. She also identified Jackson from a photographic lineup as the inmate who escaped on June 25, 2009. Finally, she identified the silver revolver found in Sergeant Chestnut's vehicle as the weapon given to her by the Delta Correctional Facility.

Sergeant Perry Jones, another corrections officer at the Delta Correctional Institute, testified that he escorted Jackson and another inmate to the optometrist's office in Greenwood. He said both inmates were restrained with handcuffs, a waist belly chain, hands secured to the waist, and leg irons. Sergeant Jones said the prison policy for off-site excursions was that the inmates were not informed that they were going anywhere and were simply placed in the van. He acknowledged that there

14

were some employees who knew when an inmate was scheduled to be taken off-site.

Sergeant Jones stated that on June 25, 2009, they arrived at the optometrist's office a few minutes before it opened. When the office employees arrived, Sergeant Jones and the other officers unloaded Jackson and the other inmate and walked with them through the back door of the clinic. Jackson was escorted to an examination room by Sergeant Robertson, another officer. The other inmate was placed in a chair. Sergeant Jones sat on a bench in the middle of the office to observe what was happening, and Sergeant Flowers was seated near the entry door. Almost immediately after they walked inside, Logan entered the clinic. Sergeant Jones identified Logan at trial as the man who entered the optometrist's office. Logan immediately fired a shot into the ceiling and told everyone to get on the floor. Sergeant Jones described Logan's gun as a "silver semiautomatic handgun." Logan demanded the keys, and the officers eventually realized that Logan wanted the keys to unlock Jackson's handcuffs and leg shackles. Logan pointed his gun at Sergeant Flowers's head and removed her gun from its holster.

At that point, one of the nurses ran to the back of the office, and Logan told them that if the nurse did not come back, he was going to "blow [Sergeant Flowers's] head off." Sergeant Robertson, who had been in the back, retrieved the keys and threw them onto the floor. Logan told Sergeant Flowers to remove Jackson's cuffs, and when she was unable to remove all of them, Jackson took the keys and removed them himself before changing into clothes from Logan's duffle bag. Logan fired a second shot inside the clinic, and Jackson told Logan to calm down because he was screaming. After changing clothes, Logan left the building, and Jackson followed him outside. Sergeant Jones said that when Detective Tarkington showed him a photographic lineup approximately two weeks after the incident, he identified Logan as the man who helped Jackson escape.

Ashley Bowlin, an employee at the optometrist's office, testified that she was present when Jackson escaped from the clinic on June 25, 2009. Shortly after the officers and inmates entered the office, Logan entered the office through the back door. When Bowlin asked if she could help him, Logan raised a gun with his right hand, fired a shot, and told everyone to get on the floor. Bowlin slid into her boss's office, and shut the door. Logan began screaming at her to open the door, and when she finally opened it, Logan put his gun in her face and told her he would "blow [her] f[————] head off." Logan returned a short time later, placed the gun in Bowlin's face again, and told her to get off the phone. Bowlin replied that she was not on the phone because there was no phone in that office. A short time later, Bowlin heard a second gunshot and was unsure whether anyone had been injured. Finally, she heard Sergeant Jones ask if everyone was okay. Bowlin said she was unable to get a good look at Logan because she was "staring down the barrel of a gun at the time."

15

Margaret Davis, another employee at the optometrist's office, stated that she was also present during the incident on June 25, 2009. When she arrived at work, she heard something that sounded like a gunshot. As she approached to the door, Logan threw it open, put a small silver semi-automatic handgun in her face, and told her to "[g]et in the building, B[——]." Logan screamed at her to get on the floor, and she complied. She saw that two correctional officers were also lying on the floor. Davis observed Logan pacing and yelling and saw Jackson changing his clothes with handcuffs dangling from one wrist. When Logan began screaming about the location of the other employee, Jackson told Logan to calm down and to leave the building. Logan exited the clinic, and Jackson followed him. Approximately two weeks after the June 25, 2009 incident, Davis identified Logan from a photographic lineup presented by Detective Tarkington. She also identified Logan at trial as the man who put the gun in her face. Davis said she had "no doubt at all" and was "positive" about her identification of Logan.

*Logan*, 2015 WL 5883187, at *1-6.

The Tennessee Court of Criminal Appeals summarized the proof adduced during Petitioner's post-conviction hearing as follows:

Petitioner testified at the evidentiary hearing that his court-appointed counsel told him to "file a post-conviction motion" when Petitioner "got to prison," and that trial counsel "would admit that he didn't do his job." Petitioner testified that trial counsel should have challenged the traffic stop for lack of probable cause. He testified that the traffic stop was illegal because he was wearing his seatbelt. Petitioner testified that trial counsel should have requested a change of venue. Petitioner testified that he believed "there was no way [he] could have . . . receive[d] a fair trial" in Davidson County, where the victim was a police officer.

Petitioner testified that he would have testified at trial but for trial counsel's failure to inform him that he had already been indicted in Mississippi. Petitioner testified that he chose not to testify based on trial counsel's advice that if he testified at his trial in Tennessee, his testimony "would have been used against [him] to obtain an indictment" in Mississippi. If he had testified at trial, Petitioner would have testified that he was under duress and, therefore, could not have been criminally responsible for the shooting of Sergeant Chestnut. Petitioner acknowledged that he had helped Jackson escape from prison. He testified that he did not know Jackson had a gun. Petitioner testified that he "had no choice" but to flee the scene because Sergeant Chestnut pulled his gun after Jackson shot him.

Trial counsel testified that he could not recall how many times he met with Petitioner, but his notes indicated that he had "at least eight meetings with [Petitioner]" in jail. Trial counsel recalled that co-defendant Jackson pleaded guilty to the charges shortly before Petitioner's trial began. Jackson received a longer sentence than Petitioner. Jackson did not testify at Petitioner's trial. Trial counsel

16

testified that both Petitioner and Jackson had given statements to police following their arrests. Trial counsel testified that Jackson stated that after the shooting, he told Petitioner "to get in the car and drive or [he would] shoot [Petitioner]." Trial counsel testified, however, that he did not "know how [Jackson's testimony] could have helped [Petitioner], other than if he had stuck with his story."

Trial counsel testified that he filed a motion to exclude evidence of Petitioner's crimes in Mississippi under Tennessee Rule of Evidence 404(b), and the trial court denied his motion. Trial counsel advised Petitioner of his right to testify in his defense. He testified that he sent a letter to Petitioner advising Petitioner of the potential charges against him in Mississippi. Trial counsel testified that Petitioner "was facing potential life sentences in the state of Mississippi, more time than he was facing [in Tennessee]." Trial counsel advised Petitioner that his testimony in this case could be used against him in a trial on his charges in Mississippi. Trial counsel testified, "[s]o we did have that discussion, and he decided not to [ ] testify. And that would have been my advice, at that point, not to have gotten on the stand."

Regarding a change of venue, trial counsel testified, "I don't know if a change of venue would have helped, I did investigate that. I did collect media reports here." He testified that he discussed the issue with Jackson's trial counsel and other attorneys more experienced with cases involving requesting a change of venue. He testified, "the consensus was that [ ] we were likely going to get a jury from an even more conservative part of the state" if venue was changed. Trial counsel testified that in hindsight, knowing Defendant would be convicted as charged, he would have had nothing to lose by requesting a change of venue. Trial counsel testified that "[t]here was a large amount of media coverage" about the shooting. He testified that he questioned potential jurors about whether they had seen media coverage and whether they had formed an opinion. Trial counsel also filed a motion to prohibit the jury from watching news or social media during the trial. He testified that the media coverage "had kind of died off" by the time Petitioner's trial began.

Trial counsel testified that he had discussions with Petitioner about filing a motion to suppress. Petitioner stated that the stop was improper because his windows were too dark for Sergeant Chestnut to have seen whether Petitioner was wearing his seatbelt. Trial counsel testified, "I'm not sure what a suppression motion would have suppressed." Trial counsel stated that there was dashcam video evidence of the shooting, and any items of evidence that might have been excluded based on an illegal stop were not discovered until after Sergeant Chestnut had been shot and Petitioner and Jackson had driven away.

Trial counsel did not recall that Petitioner wanted to assert the defense of duress. Trial counsel testified that Jackson made a statement to the police that he told Petitioner after the shooting, "let's go or I'm going to shoot you." Trial counsel testified that was the only evidence of duress, "but that was after the escape and after the shooting." Trial counsel testified that he did not recall Petitioner "ever

17

mentioning that there was any duress" concerning Petitioner's going to Mississippi, the criminal acts committed in Mississippi, or driving Jackson through Tennessee.

*Logan v. State*, No. M2018-01786-CCA-R3-PC, 2020 WL 918607, at *2 (Feb. 26, 2020).

B. <u>Standard of Review</u>

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (internal citations and quotation marks omitted). As the Supreme Court explained, the AEDPA "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). The AEDPA, therefore, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id.*

One of the AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in 28 U.S .C. § 2254(d). Under the AEDPA, the court may grant a writ of habeas corpus on a claim that was adjudicated on the merits in state court if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 405 (2000). Under Section 2254(d)(1), a state court's decision is "contrary to" clearly established federal law "'if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision [of the Supreme Court]

18

and nevertheless arrives at a [different result].'" *Hill v. Curtin*, 792 F.3d 670, 676 (6th Cir. 2015) (en banc) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)). "Under the 'unreasonable application' clause of [Section] 2254(d)(1), habeas relief is available if 'the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (quoting *Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008)). A state court's application is not unreasonable under this standard simply because a federal court finds it "incorrect or erroneous"—instead, the federal court must find that the state court's application was "objectively unreasonable." *Id.* (quoting *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003)).

To grant relief under Section 2254(d)(2), a federal court must find that "the state court's factual determination was 'objectively unreasonable' in light of the evidence presented in the state court proceedings." *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). State court factual determinations may be found unreasonable only "if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017) (quoting *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007)). "[I]t is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011) (citing *Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011)). As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). Subject to Habeas Rule 7, review under § 2254(d) (1) "is limited to the record that was before

19

the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011).

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court . . . thereby alerting that court to the federal nature of the claim." *Id.* (citation omitted); *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996) (the substance of the claim must have been presented as a federal constitutional claim). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *See Picard v. Connor*, 404 U.S. 270, 275 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). In Tennessee, a petitioner is "deemed to have exhausted all available state remedies for [a] claim" when it is presented to the Tennessee Court of Criminal Appeals. *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39). Claims that are not exhausted are procedurally defaulted and "ordinarily may not be considered by a federal court on habeas review." *Alley v. Bell*, 307 F.3d 380, 388 (6th Cir. 2002).

A procedural default can occur in one of two ways. First, a procedural default may occur if the state court actually "relied on the procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985). Second, if a petitioner fails to properly exhaust a claim in state court, and the claim can no longer be raised in state proceedings because of a failure to follow state procedure for presenting such a claim, the claim is technically

20

exhausted (given that there is nothing additional the petitioner could do to obtain relief in state court), but a petitioner is not automatically entitled to present his claim on federal habeas review, as his claim is procedurally defaulted. *Woodford v. Ngo*, 548 U.S. 81, 126 (2006).

"In order to gain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate cause and prejudice for the failure, or that a miscarriage of justice will result from the lack of review." *Id*. at 386. The burden of showing cause and actual prejudice to excuse defaulted claims is on the habeas petitioner. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman*). A petitioner may establish cause by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. *Id.*

Constitutionally ineffective assistance of trial or appellate counsel may constitute cause. *Murray*, 477 U.S. at 488-89. Generally, however, if a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself have been presented to the state courts as an independent claim before it may be used to establish cause. *Id.* If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can be used as cause for the underlying defaulted claim only if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim. *Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000).

Petitioners in Tennessee also can establish "cause" to excuse the procedural default of a substantial claim of ineffective assistance of trial counsel by demonstrating the ineffective assistance of post-conviction counsel in failing to raise the claim in initial review post-conviction

21

proceedings. *See Martinez v. Ryan*, 566 U.S. 1, 5-6 (2012) (creating an exception to *Coleman* where state law prohibits ineffective assistance claims on direct appeal); *Trevino v. Thaler*, 569 U.S. 413, 429 (2013) (extending *Martinez* to states with procedural frameworks that make meaningful opportunity to raise ineffective assistance claim on direct appeal unlikely); *Sutton v. Carpenter*, 745 F.3d 787, 792 (6th Cir. 2014) (holding that *Martinez* and *Trevino* apply in Tennessee). The Supreme Court's creation in *Martinez* of a narrow exception to the procedural default bar stemmed from the recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Martinez*, 566 U.S. at 13. In other words, *Martinez* requires that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," and that "the underlying ineffective-assistance-of-trial-counsel claim [be] a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *See id*. at 13-15. Importantly, *Martinez* did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in *Coleman*.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his <u>actual</u> and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the Supreme Court also has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who

22

is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray*, 477 U.S. at 496). A petitioner must show "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *McQuiggin v. Perkins*, 569 U.S. 383, 399 (2013) (internal quotation marks omitted) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). For a petitioner to "pass through the gateway" and be permitted to argue the merits of his defaulted claims, he must show "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non-harmless constitutional error." *Id.* at 401 (internal quotation marks omitted) (quoting *Schlup*, 513 U.S. at 316).

With these principles in mind, the court will turn to the examination of the claims raised in Logan's petition for habeas relief.

C. Analysis

Petitioner is not entitled to relief under Section 2254 because his claims are without merit or are procedurally defaulted without sufficient cause. The court will begin with Petitioner's extradition-related claims.

### 1. *Extradition-Related Claims*

Three of Petitioner's claims challenge his 2011 extradition, conducted after he was convicted in Tennessee, so that he could be tried in Mississippi. Petitioner's first claim alleges that he was "[i]nvoluntarily transfer[r]ed [to Mississippi] under Article IV of the I.A.D. policy." (Doc. No. 1, PageID# 5). His second claim is that the transfer to Mississippi was a "[d]ue process violation." (*Id.*, PageID# 7-8). His third claim alleges "[d]enial of access to courts and counsel," in that his Mississippi detention was impeding a hearing on his motion for new trial in Tennessee and his desire to file a direct appeal. (*Id.*, PageID# 10- 11).

23

"Once the fugitive is returned to the demanding state, the right to challenge extradition becomes moot." *Barton v. Norrod*, 106 F.3d 1289, 1298 (6th Cir. Feb. 13, 1997). The Sixth Circuit so held because a writ of habeas corpus filed by a fugitive "only affects his detention in the asylum state. It does not affect the underlying charges against him." *Id*. The court previously applied this controlling precedent in denying Petitioner's challenges to his extraditions from Tennessee to Mississippi (the same challenged here) and from Mississippi back to Tennessee. *See Logan*, No. 3:15-cv-00787, Doc No. 42 at 2; *Logan*, 2019 WL 4142160, at *5.

Petitioner is once again detained in Tennessee, the sending, or asylum, state. But his extradition challenge does not challenge his present custody in Tennessee; instead, it challenges his custody as of 2013 and requests that he be transferred to Tennessee "for a new trial hearing." *See* Doc. No. 1, PageID# 15 (requesting relief in the form of "transfer[] to the sending state for new-trial hearing."). His present custody is pursuant to his Tennessee convictions, which he does not challenge in the first three claims of his federal habeas petition. And the hearing on Petitioner's motion for new trial was held long ago. *See State v. Logan*, No. M2014-10687-CCA-R3-CD, 2015 WL 5883187 (Tenn. Crim. App. Oct. 8, 2015), *perm. app. denied* (Tenn. Feb. 18, 2016). Thus, the extradition challenges are moot.

Additionally, Petitioner has no standing to assert these claims. Petitioner's first claim references "Article IV of the I.A.D. policy." (Doc. No. 1, PageID# 5). But Mississippi is not a signatory to the Interstate Agreement on Detainers (I.A.D.). *See Logan v. Mississippi*, No. 4:13CV122-GHD-DAS, 2015 WL 576573, at *2 (N.D. Miss. Feb. 11, 2015) (denying Petitioner's requests for relief including "a hearing to determine whether he was actually a fugitive at the time of his arrest, detention, and subsequent extradition," and "for Mississippi and Tennessee to follow the requirements of the Interstate Agreement on Detainers"; explaining that the provisions of the

24

Interstate Agreement on Detainers did not apply in Petitioner's case because "Mississippi is not a signatory to the IAD"). The Extradition Clause in Article IV of the U.S. Constitution does not create an individual right. *Logan*, 2019 WL 4142160, at *5 (quoting *Barton*, 106 F.3d at 1295) ("neither the Extradition Clause of the Constitution nor the federal extradition statute purports to confer any right on the fugitive. Rather, they confer rights and duties on the executive authorities of the states."). Petitioner's second claim, that the extradition violates his due process rights is a repetition of his first claim.

His third claim, that he was denied "access to courts and counsel" as a result of the extradition, would fail even if it were not moot. (Doc. No. 1, PageID# 10-11). Petitioner alleges that, while detained in Mississippi, he was "denied access to case statu[t]es and case law from the sending state of [T]ennessee" for use in his pending motion for new trial in Tennessee. (*Id.*, PageID# 10). However, contrary to Petitioner's assertion, he was represented by counsel on that motion, which was drafted by one attorney and argued by another. The "attorney who suggested [Petitioner] waive [his] right to appear at the new trial hearing" was Petitioner's court-appointed counsel, who represented him at that hearing. (Doc. No. 100-1, PageID# 1887-88). A defendant has no right to be present at a post-trial hearing. *See United States v. Burke*, 345 F.3d 416, 422 (6th Cir. 2003) (citing *United States v. Lynch*, 132 F.2d 111 (2d Cir. 1942)). Thus, even if this claim were cognizable here, despite Petitioner not challenging his present confinement under his Tennessee convictions, the claim lacks merit.

In summary, Petitioner's extradition-related claims are either moot or Petitioner lacks standing to pursue them.

25

*2. Ineffective Assistance of Counsel Claim*

Petitioner's fourth and final claim is procedurally defaulted. Petitioner has not demonstrated cause and prejudice to excuse the default. Neither does Petitioner assert that a fundamental miscarriage of justice will occur if the Court does not excuse the default and review this claim on the merits. The claim is therefore barred from review in this court.

In Ground Two, Petitioner alleges that trial counsel's "failure to investigate resulted in [] incompetence in filing a 404(b) motion" and therefore "defaulting on Petitioner's [Fourth] Amendment claim." (Doc. No. 1, PageID #9).

In his post-conviction hearing, Petitioner alleged that "trial counsel should have challenged the traffic stop for lack of probable cause," and "[t]rial counsel testified that he filed a motion to exclude evidence of Petitioner's crimes in Mississippi under [Rule] 404(b)." *Logan*, 2020 WL 918607, at *1-2. Petitioner's post-conviction petition was denied and, on the appeal of denial of post-conviction relief, Petitioner did not raise the claim he now raises as Ground Two. The Tennessee Court of Criminal Appeals held that the only ineffective-assistance claim properly before it on appeal from the denial of post-conviction relief was "trial counsel's failure to make a motion for a change of venue. Accordingly, all other claims that were raised in Petitioner's post-conviction petition and asserted by Petitioner at the post-conviction hearing are waived." *Id*. at *2.

Because Petitioner did not present Ground Two to the Tennessee Court of Criminal Appeals on post-conviction appeal, the first court of competent jurisdiction, he procedurally defaulted this claim. 28 U.S.C. § 2254(c); *Coleman*, 501 U.S. at 732. He therefore has waived the claim for purposes of federal habeas corpus review. The court can only review this defaulted claim if Petitioner establishes cause for the default and actual prejudice or that the court's failure to

26

address these claims would result in a fundamental miscarriage of justice. Petitioner has not done so.

In summary, Petitioner does not acknowledge his default of this claim. He does not attempt to establish cause or prejudice to excuse the defaults. Neither does he argue that a fundamental miscarriage of justice would occur if the court does not excuse the defaults and address the claim on the merits. This claim is therefore barred from review in this court.

## VI. CONCLUSION

For the reasons set forth herein, Petitioner's Motion for Leave to Amend Habeas Petition (Doc. No. 112) is **DENIED**. Likewise, Petitioner's Request for Discovery (Doc. No. 114) is **DENIED**.

Respondent's Motion to Dismiss (Doc. No. 108) is **GRANTED**, though for reasons different than those offered by Respondent. The petition seeking relief under 28 U.S.C. § 2254 is **DENIED WITH PREJUDICE**, and this action is **DISMISSED.**

## VII. CERTIFICATE OF APPEALABILITY

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas petition may not proceed unless a certificate of appealability ("COA") is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). The district court must either issue a COA indicating which issues satisfy the required showing or

provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

The Court has found that Petitioner is not entitled to relief under Section 2254 because his extradition-related claims are without merit (they are moot and/or Petitioner lacks standing) and his sole ineffective assistance of counsel claim is procedurally defaulted without sufficient cause. Because jurists of reason would not disagree with the resolution of Petitioner's claims, the court **DENIES** a COA as to each claim. However, Petitioner may seek a COA from the Sixth Circuit.

It is so **ORDERED**.

Aleta A. Trauger
United States District Judge

28